UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Nicole Yzaguirre,                                                    Civil No. 10-3793 (DWF/JJK)

          Plaintiff,

v.                                                                             **MEMORANDUM
                                                                            OPINION AND ORDER**

Eric Norling,
in his individual capacity,

          Defendant.

_____

Jill Clark, Esq., Jill Clark, PA, counsel for Plaintiff.

Amanda L. Stubson, Esq., Jason M. Hiveley, Esq., and Jon K. Iverson, Esq., Iverson Reuvers, LLC, counsel for Defendant.

_____

# INTRODUCTION

This matter is before the Court on Defendant's Motion for Summary Judgment (Doc. No. 11). For the reasons set forth below, the Court denies Defendant's motion.

# BACKGROUND

Plaintiff's claims arise from Plaintiff's arrest at her place of employment. On June 7, 2010, Plaintiff was working in the MoneyCenter at Wal-Mart in Bloomington, Minnesota. (Doc. No. 13, Hively Aff., Ex. A ("Yzaguirre Dep.") at 14:1-17, 22:2-9.) On that date, suspect James Bulger and an accomplice Bulger identified only as "L.A." went to Wal-Mart to cash a forged United States Treasury check. (Doc. No. 14, Norling Aff.,

Ex. 2 ("Bulger Interview"); Yzaguirre Dep. 26:2-16.)  The check was originally made payable to Kristina Campbell in the amount of $674 but had been altered to be made payable to "James O Bulger" in the amount of $3,674.  (Norling Aff. ¶ 2, Ex. 1; Yzaguirre Dep. 22:10-23:1, Ex. 1.)  Plaintiff had never seen Bulger before but had been introduced to the individual known as L.A. by a mutual friend, Markita Seahorn, a few months earlier.  (Yzaguirre Dep. 25:19-26:16, 37:17-39:6.)

Bulger and L.A. went to the MoneyCenter area of the store, and L.A. observed from a short distance away as Bulger approached Plaintiff's lane to cash the forged check.  (*Id.* at 26:6-16.)  Bulger signed the back of the check, handed the check and his I.D. to Plaintiff, and typed in his social security number on a keypad while Plaintiff typed in Bulger's state ID number and the amount of the check.  (*Id.* at 26:6-27:15.)  Plaintiff gave Bulger $3,674, and Bulger and L.A. left the store.  (*Id.* at 26:14-16.)

Plaintiff did not notice anything suspicious about the check at the time Bulger handed it to her, however, she explained that, after Bulger left "I looked at it, and then it just -- I don't know, things weren't really looking right to me, so then I just left it out so I could show my manager right away and let him figure it out."  (*Id.* at 40:11-41:11.)  After showing her manager the check, he turned it over to loss prevention.  (*Id.* at 44:11-24.)  Plaintiff was terminated the next day by Wal-Mart because Plaintiff was still in her probationary employment period, and the check she accepted was fake and in an amount greater than $100.  (*Id.* at 45:21-47:15.)  Plaintiff was told to re-apply in 60 days.  (*Id.* at 49.)

On the day of her termination for cashing the fake check, Plaintiff obtained L.A.'s cell phone number from Seahorn and sent a text message to L.A. indicating she was going to call the police on him because "he was with the person that cashed the fake check, and . . . I got fired because of that." (*Id.* at 54:6-55:3, 57:21-24.) L.A. sent a text message to Plaintiff in response indicating that he knew where she lived and that he would kill her. (*Id.* at 55:1-14.) Plaintiff never reported L.A. to the police. (*Id.* at 55:22-24.)

On July 7, 2010, Defendant became involved in the investigation of the check forgery. (Hively Aff., Ex. B ("Norling Dep.") at 13:4-15:14; Norling Aff. ¶ 2.) Upon viewing the United States Treasury check at issue, Defendant determined that the original name on the check had been replaced with Bulger's name and that a "3" was added to the original amount of "$674" to make it "$3,674." (Norling Aff. ¶ 3.)

On August 20, 2010, Detective Norling and United States Secret Service Agent Richard Grossheim arrested Bulger for the check forgery. (*Id.* ¶ 6.) Bulger made a statement to police, in which he explained that L.A. had told him he needed to approach a particular teller because she was his "inside connection."[1] (*See* Norling Dep., Ex. 2 at 5:7-13, 7:11-15; Doc. No. 16, Hively Supp. Aff. ¶ 1, Ex. C.)

Defendant then contacted Wal-Mart to determine the identity of the teller. (Norling Aff. ¶ 8.) Wal-Mart identified the teller as Plaintiff Nicole Yzaguirre and

---

[1]    Plaintiff maintains that L.A. never asked her to cash a forged check for him. (Yzaguirre Dep. at 39:10-19.)

indicated that, while she had been initially terminated for cashing the fake check, Plaintiff had been re-hired and would be working the following week. (*Id.*; *see also* Yzaguirre Dep. at 46:1-5, 49:2-50:4.)

On August 27, 2010, Detective Norling and Agent Grossheim interviewed Plaintiff at Wal-Mart, where she was working, at that time, as a cashier. (Norling Dep. at 41:1-8; Yzaguirre Dep. at 50:8-52:2.) Detective Norling and Agent Grossheim asked Plaintiff, among other things, how she knew the individual who was with James Bulger. (Yzaguirre Dep. at 53:22-54:5.) Plaintiff responded that she knew the person with Bulger through her friend Markita Seahorn and that she had texted him after she cashed the fake check "[b]ecause he pretty much cost[] me my job." (*Id.* at 53:20-54:22.) Because Plaintiff did not have the phone number for Seahorn or the individual with Bulger,[2] Detective Norling asked Plaintiff to come to the Bloomington Police Department to produce her cell phone records. (*Id.* at 63:1-5; Compl. ¶ 8.)

Defendant contacted Plaintiff on August 30, 2010, and further explained that she needed to come to the Bloomington Police Department (at 12:30 p.m. the following day) for a formal booking process, that she was not being charged with a crime yet, and that she would be immediately released. (Norling Aff. ¶ 10, Ex. 3 at 3-4.)

On August 31, 2010, Plaintiff's attorney, Jill Clark contacted Defendant by phone and told Defendant that he should not contact Plaintiff. (Norling Aff. ¶ 11.) Before noon

---

[2]   Plaintiff claims that Defendant took her cell phone out of her hand without her consent and searched it. (Yzaguirre Dep. at 52:15-53:19.)

4

on that date, Ms. Clark sent Defendant a memorandum (via facsimile and e-mail) memorializing their conversation, in which she claimed to assert Plaintiff's right to remain silent and Plaintiff's right to counsel. (Clark Decl. ¶ 2, Ex. 1 ¶ 5.) Because Plaintiff did not appear at the scheduled time, Defendant decided to go to Wal-Mart to arrest her. (Norling Dep. at 87:14-24; Norling Aff. ¶ 12.) At 2:30 p.m., Defendant went to Wal-Mart to arrest Plaintiff. (Norling Dep. at 53:9-17; Norling Aff. ¶ 12 ("Because Plaintiff did not voluntarily appear at the Police Department on August 31, 2010, as expected, I went to Wal-Mart at 2:30 p.m., to arrest Plaintiff for probable cause forgery and have her booked at the police department."))

Detective Norling went to Wal-Mart, entered the break room where Plaintiff was on a fifteen-minute break, asked Plaintiff to stand up, put handcuffs on her, and explained that he was arresting her. (Yzaguirre Dep. at 61:24-15, 82:6-9.) Plaintiff claims that Defendant "specifically told me that he was arresting me because I did not come to the 12:30 meeting. He did *not* say I was being arrested for felony forgery (or anything similar)." (Yzaguirre Aff. ¶ 4.) Detective Norling then "walked [Plaintiff] through the store, all the way to the front out to the police car." (Yzaguirre Dep. at 62:10-15; Norling Dep. at 87:9-10.) Plaintiff further claims that Defendant told her supervisor at the time of her arrest at Wal-Mart that she had "pending charges" (when in fact there were no charges pending) and thus caused her suspension. (Yzaguirre Dep. at 66-67, 73; Yzaguirre Aff. ¶ 5.) After her arrest, Plaintiff indicated that she wanted an attorney and

did not make a statement. (Yzaguirre Dep. at 64:19-65:19.) Plaintiff was photographed, fingerprinted, and released.[3] (*Id.* at 64:14-66:4.)

Following his investigation and Plaintiff's arrest, Defendant submitted the case to the Hennepin County Attorney's Office for the evaluation of felony forgery charges against Bulger and aiding and abetting felony forgery charges against Plaintiff. (Norling Aff. ¶ 13.) To date, Plaintiff has not been criminally charged in relation to the check forgery. (*See* Yzaguirre Aff. ¶ 5.)

---

[3]     Defendant's report, dated September 9, 2010, states, in relevant part:

On 08/30/2010 I contacted Yzaguirre and stated that I needed her to come to Bloomington Police Department for a formal booking process (fingerprints, photos, and a formal statement). I advised her that she wasn't being charged with a crime at this time and that I would immediately release her. Because of the severity of the crime and the ongoing investigation, I wanted a formal booking process completed on her and I had probable cause to arrest her (department protocol). We worked out a time around her work schedule and made an appointment for 1230 the following day.

The following day I received a call from Jill Clark stating that she was an Attorney for the family of Yzaguirre. She advised me not to speak with her client. I was unable to confirm Jill Clark's identity as an attorney over the phone.

Yzaguirre didn't show-up for our appointment for the booking process at 12:30 PM. Detective Krogh and I went to Wal-Mart at 2:30 PM to see if Yzaguirre had shown up to work. She was at work and I arrested her for PC forgery without incident. I transported her to the Bloomington Police Department where she was booked and released pending charges. She refused to speak with me at the Bloomington Police Department without her attorney present.

(Norling Aff., Ex. 3 at 3-4.)

In this action, Plaintiff asserts two claims against Defendant: (1) Violation of 42 U.S.C. § 1983 (Count I); and (2) Intentional Interference with Contract (Count II). Defendant now moves for summary judgment.

## DISCUSSION

### I.   Summary Judgment Standard

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but must set forth specific

facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II.     Plaintiff's Claims

Defendant has moved for summary judgment with respect to both Plaintiff's claim of First Amendment retaliation and her claim of intentional interference with contract.

### A.     First Amendment Retaliation Claim

Plaintiff asserts that Defendant violated 42 U.S.C. § 1983 when he arrested her at her place of employment in retaliation against her for exercising her constitutional right to remain silent and freedom to associate with counsel. Plaintiff asserts that the exercise of both of these liberties implicates the First Amendment.

"To establish a First Amendment retaliation claim under 42 U.S.C. § 1983, the plaintiff must show (1) he engaged in a protected activity, (2) the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004). In short, a plaintiff must show that the government official "took the adverse action because the plaintiff engaged in the protected speech." *Id.* The causal connection element is generally a question for the jury, "but it can provide a basis for summary judgment when the 'question is so free from doubt as to justify taking it from the jury.'" *Id.*

Defendant contends that he is shielded from Plaintiff's First Amendment retaliation claim by qualified immunity. The doctrine of qualified immunity protects state actors from civil liability when "'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Sexton v. Martin*, 210 F.3d 905, 909 (8th Cir. 2000) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A plaintiff can overcome the defense of qualified immunity by showing that: "(1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010) (internal quotation omitted).

The evidence before the Court reflects that Plaintiff was arrested at her workplace on August 31, 2010, shortly after Defendant learned that she would not be attending the scheduled 12:30 p.m. meeting. The impetus behind Plaintiff's arrest is a genuine issue of material fact in dispute by the parties. Plaintiff asserts that Defendant's basis for arresting her was simply retaliatory in nature. She claims that Defendant decided to arrest her solely because she had retained counsel and refused to attend the meeting; but for the exercise of these freedoms, Defendant would not have arrested Plaintiff. Defendant appears to concede that Plaintiff's failure to appear for the scheduled meeting supported, at least in part, his decision to effectuate the arrest. (Norling Aff. ¶ 12 ("Because Plaintiff did not voluntarily appear at the Police Department on August 31,

2010, as expected, I went to Wal-Mart at 2:30 p.m., to arrest Plaintiff for probable cause forgery and have her booked at the police department.").)[4]

Viewing the facts in the light most favorable to Plaintiff, a jury could reasonably conclude that Plaintiff's decisions to retain an attorney and not to meet with Defendant at the police station at the scheduled time were substantial factors in Defendant's decision to arrest her. *See Baribeau v. City of Minneapolis*, 596 F.3d 465, 481 (8th Cir. 2010) ("Retaliation need not have been the sole motive, but it must have been a 'substantial factor' in the decision to arrest."). It also appears to the Court that the threat of arrest as a result of associating with an attorney or refusing to speak to law enforcement would likely "chill a person of ordinary firmness" from engaging in those protected activities. *See id.*

Based on the above, the Court determines that Plaintiff has presented sufficient evidence to overcome Defendant's assertions of qualified immunity and thus to survive summary judgment. In so holding, the Court notes that it is not concluding, as a matter of law, that Defendant retaliated against Plaintiff in violation of 42 U.S.C. § 1983. Rather, the Court concludes that, viewing the evidence in the light most favorable to Plaintiff, a reasonable juror could conclude that Defendant arrested Plaintiff as a direct result of her

---

[4] Although the Court need not reach the issue, the Court seriously questions whether probable cause existed for Plaintiff's arrest.

decisions to retain counsel and to not meet with Defendant as scheduled (and not on the basis of probable cause for the underlying offense).[5]

### B. Intentional Interference with Contract Claim

Plaintiff also claims that Defendant intentionally interfered with her employment contract with Wal-Mart.

To establish a claim for tortious interference with a contractual relationship, a plaintiff must demonstrate: "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages." *Furlev Sales and Assoc., Inc. v. N. Am. Auto. Warehouse, Inc.*, 325 N.W.2d 20, 25 (Minn. 1982).

Defendant asserts that this claim is barred by the doctrine of official immunity. Official immunity is a common law doctrine that provides public officials with a defense to state law tort claims. *Mumm v. Mornson*, 708 N.W.2d 475, 490 (Minn. 2006); *Johnson v. Morris*, 453 N.W.2d 31, 41-42 (Minn. 1990). "Official immunity prevents a public official charged by law with duties which call for the exercise of his judgment or discretion from being held personally liable for damages, unless the official has

---

[5] Defendant contends that he needed only "arguable probable cause" in order to be entitled to qualified immunity here. The Court finds this case to be distinguishable from the retaliatory prosecution cases on which Defendant relies. *Contra Hartman v. Moore*, 547 U.S. 250 (2006) (holding that a plaintiff must plead absence of probable cause for the underlying charge in a retaliatory prosecution case, in which criminal charges were actually brought against the plaintiff); *Williams v. City of Carl Junction*, 480 F.3d 871 (finding that, because the plaintiff failed to show that police officers lacked probable cause to issue criminal citations, he could not establish a "necessary element of his

(Footnote Continued on Next Page)

committed a willful or malicious act." *Mumm*, 708 N.W.2d at 490 (internal quotations omitted). In conducting an official immunity analysis, a court must first determine whether the conduct at issue involved ministerial or discretionary duties. *Id.* If the duties are discretionary, the issue then becomes whether the official acted willfully or maliciously. *Id.*

Plaintiff claims that Defendant told her supervisor at the time of her arrest at Wal-Mart that she had "pending charges" (when in fact she was never charged with a crime) and thus caused her suspension. (Yzaguirre Dep. at 66-67, 73; Yzaguirre Aff. ¶ 5.) Defendant's decisions to arrest Plaintiff and to tell her supervisor that Plaintiff had pending charges were clearly discretionary acts. *See Kelly v. City of Minneapolis*, 598 N.W.2d 657, 665 (Minn. 1999) ("The circumstances surrounding the arrest of a suspect do not involve the 'fixed and designated facts' and 'absolute, certain and imperative' duties of a ministerial act. Each situation is unique and requires the exercise of judgment by the officer based upon the objective circumstances of the moment."); *see also Reasonover v. St. Louis County,* 447 F.3d 569, 585 (8th Cir. 2006) ("The investigation of a crime is a discretionary act, not a ministerial one."). Thus, the question becomes whether Defendant acted willfully or maliciously in arresting Plaintiff and in communicating to Plaintiff's employer that she had "pending charges" when in fact she had not been charged with a crime.

---

(Footnote Continued From Previous Page)
retaliatory-prosecution claim").

The Court concludes that genuine issues of material fact exist as to whether Defendant acted willfully or maliciously.  Whether Defendant acted willfully or maliciously in effectuating the arrest and in communicating that Plaintiff had pending charges to Plaintiff's employer is a question of fact reserved for the jury and to be resolved at trial.  Consequently, the Court determines that Plaintiff has presented sufficient evidence to overcome Defendant's assertion of official immunity and thus to survive summary judgment on her tortious interference claim.

Because the Court concludes that genuine issues of material fact exist with respect to both Counts I and II of Plaintiff's Complaint, Defendant is not entitled to summary judgment on either of Plaintiff's claims.

## ORDER

Based upon the foregoing, and the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment (Doc. No. [11]) is **DENIED** in its entirety.

Dated:  December 21, 2011          s/Donovan W. Frank\
                                   DONOVAN W. FRANK
                                   United States District Judge